UNITED STATES, Appellee

v.

Richard E. SCHLOESSER, Sergeant
U.S. Air Force, Appellant.

No. 93–0724.
CMR No. 29193.

U.S. Court of Military Appeals.

Argued April 6, 1994.
Decided Sept. 22, 1994.

For Appellant: *Captain Robert I. Smith* (argued); *Colonel Jay L. Cohen* (on brief); *Colonel Terry J. Woodhouse* and *Lieutenant Colonel Frank J. Spinner.*

For Appellee: *Major Barnard N. Madsen* (argued); *Colonel Jeffery T. Infelise* (on brief).

*Opinion of the Court*

WISS, Judge.

On June 10, 1990, appellant was caught in a reverse sting operation* by two "investigative assistant[s]" working with the Joint Drug Enforcement Team (JDET). The operation netted a general court-martial conviction of appellant, after a contested trial, for possession of cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a, and a sentence extending to a bad-conduct discharge, confinement for 3 months, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed in an unpublished opinion.

On appellant's petition for review on the merits, this Court specified the issue of whether the evidence was sufficient as a matter of law to sustain appellant's conviction. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Now, after full consideration, we hold that it was.

I

Linda Rodriguez, formerly a commander's secretary, was an investigative assistant with the Air Force Office of Special Investigations (OSI) whose duties were to provide administrative support, including handling evidence and typing agents' reports of investigation. In June 1990, however, Rodriguez was working with the JDET as part of a reverse sting operation with Sergeant Maria Ayreen Desagun, a "security policewoman" working with the OSI. As of that date, Rodriguez had worked for OSI for less than 1 year, and Desagun had worked for JDET for about a

---

* Investigator Rodriguez defined a "reverse sting operation" as one in which subjects "say that they use drugs, they name the drug, they bring up the subject, and yet they do not have the drug on themselves. Then I offer and say that we do have the drugs with us."

month. The extent of Rodriguez' preparation for the operation that snared appellant was to watch a video on entrapment and get briefed by the team leader, OSI Special Agent Bone.

According to the prosecution's evidence at trial, the following description of the relevant events unfolded. About 11:30 on the night of June 10, the two women arrived at the Lackland Air Force Base Noncommissioned Officers Club, parked their car in a lighted area of the parking lot, and entered the club. After ordering drinks, they decided to "let people know that we're single and we're available" by "mingl[ing] with the crowd and maybe ask someone to dance with us...." That lucky "someone" was appellant.

The two danced to "maybe two or three songs" and then parted company. After a short while, however, they reconnected and "talked ... for a little while." At some point, Rodriguez asked appellant, "Do you like to party?" Appellant suggested they return to Rodriguez' table; once there, she asked, "So what do you like to do?" Appellant answered, "Well, coke is my favorite." After some small talk, Rodriguez asked appellant, "Do you have any cocaine on you?", and he replied, "No." Prepared for such a potential dead-end, however, Rodriguez responded:

Oh, well Ayreen and I have some in our car and if you would like. Well, Ayreen and I are going to do a few lines in the car later on. That is what we usually do at night; we do a few lines in the car.

Ultimately, the three left the club and went to the women's car in the parking lot—though Rodriguez claimed that she did not "specifically invite" appellant either to go with them or to use cocaine with them. There, Rodriguez sat behind the wheel, Desagun in the back seat, and appellant in the front passenger seat.

Once all three had entered the car, Rodriguez reached over and removed from the glove compartment a plastic bag containing their drugs. After first pulling out a baggie of marijuana and tossing it into the back seat with the explanation that " 'this is bad stuff,' " she pulled out a small bag of cocaine

and said to appellant, "So show me how you use it." Appellant pulled from his back pocket his military identification card and a $5 bill.

At this point, the baggie of cocaine was "sitting right on [appellant's] left thigh." Rodriguez was "sure" that she "did not put it there," but she did not "remember" how it ended up on his thigh. Neither did Desagun "see how it got there[.]"

Appellant folded the $5 bill at one end and began "to roll it up," but it was "too wrinkled." Appellant asked if either of the women had a "newer" bill. Rodriguez described the ensuing events as follows:

A. Ayreon hands over a dollar bill to the accused, which is a newer bill. So the accused again folds one end of the dollar bill and he starts rolling it up, and by the time he finishes it looks like a thin straw. I am looking at him and he said he learned this a few years back. As I'm looking at him, he's got the ID card and the straw—I mean the dollar bill that looks like a straw and the cocaine on his left thigh.

Of course, we have the drugs between us as we're sitting in the car. We have the arm [armrest between the two front seats] down and the drugs are between us. At that time I felt that we had sufficient evidence on the accused. We have a pre-arranged signal that I signal for the agents.

Q. Let me stop you there in time. I want to ask one other question that comes before your prearranged signal.

A. Yes, sir.

Q. It deals with where you were going to use the cocaine. Was there any discussion about that during your conversations in the car?

A. Yes, sir, there was. Subject had the straw in his hand and I asked subject, I said—we're kind of looking around the corner and we're like, well where should we line it up, and I said, "How about the dash," because I have known since I have been working with JDET I've heard that line before, and I thought well maybe it

sounded like a good one, so I said, "How about the dash," and he agreed.

\*    \*    \*

Q. Again, at that point in time when you signaled for the agents, where was the cocaine?

A. The cocaine was on his left thigh.

Q. Who put them there? Did you put them there?

A. No, sir, I did not.

Later, during redirect examination and after being given the opportunity to refresh her recollection of her testimony during the Article 32, UCMJ, 10 USC § 832, hearing, Rodriguez testified about that testimony as follows:

I could not recall how Sergeant Schloesser ended up with the cocaine, but I am certain that he had to have reached over, because I had it in my possession.

The morning after appellant had been apprehended, Investigator Riffle of the JDET interviewed him. After advising appellant of his rights and securing appellant's waiver of them, Riffle took appellant's verbal statement concerning the events leading to his apprehension. During his direct testimony, Riffle was asked by trial counsel whether appellant had "describ[ed] ... how he came into possession of the cocaine[,]" and Riffle answered:

He said that he did receive the cocaine, whether it was from Linda or [the] console I can't remember but he in fact did take possession of the cocaine willingly and lay it on his lap.

Q. And you are absolutely sure he said that?

A. Yes, I am.

Curiously, this purported oral admission by appellant neither appears in the written statement which was prepared by Riffle based on appellant's oral statement nor is reflected in the agent's notes or official report of the interview.

## II

The operation that bagged appellant is not an epitome of law enforcement. Notwithstanding that the evidence is legally suffi-

cient under our standard of review of *Jackson v. Virginia, supra,* it is important to note candidly how this prosecution for mere possession of cocaine came close to unraveling because of lack of attentiveness by the relatively inexperienced operatives during the sting.

The cocaine belonged to government operatives who lured appellant to their car, and there was no evidence offered by anyone present in that car that appellant ever handled the cocaine. Even for a green operative like Rodriguez, it is hard to imagine why it would not be important for her to notice and to remember how the contraband ended up simply resting on appellant's left thigh—it goes to the very essence of appellant's "possession"; yet, while she does remember other details of that evening, she has no recollection of that critical fact. Sergeant Desagun, who was "there observing what happened," was equally mystified: "Obviously, I just missed it."

Enter, stage center: Investigator Riffle. This more experienced investigator—who saw nothing of what happened in the car due to his vantage point on stake out—conveniently offers up the missing piece to the puzzle. From the horse's own mouth, Riffle testified, came the admission that appellant took "possession of the cocaine willingly and lay it on his lap."

The credibility of this revelation, as a factfinding matter, might be seen, by some, as undermined somewhat by Riffle's curious lapse of memory as to whether appellant took "possession" "from Linda or [the] console"—which may not have legal significance but which might make one at least pause before fully accepting at face value Riffle's memory of that conversation. In addition, this important admission never made its way onto paper—either in the form of the written statement prepared by Riffle, in the body of the agent's notes, or in his report of that interview.

Still, as just mentioned, these are issues properly to be resolved by the factfinders, and they indicated their resolution by the findings of guilty. The evidence—viewed in the light most favorable to the prosecution—

is there, in the record, from which a reasonable trier of fact could conclude beyond a reasonable doubt that appellant knowingly possessed the cocaine. *See Jackson v. Virginia, supra; United States v. Turner,* 25 MJ 324 (CMA 1987). While Rodriguez could not remember how the cocaine came to rest on appellant's thigh, she was sure she did not put it there. The inference from this that appellant himself picked it up and put it there dovetails with Riffle's testimony that appellant admitted that he had taken "possession of the cocaine willingly and lay it on his lap." Additionally, appellant's actions in preparing a straw from a currency bill through which to sniff the cocaine offers further evidence that could assure a factfinder that, as appellant was then immediately prepared to use the drug, its resting place on his thigh constituted knowing possession. *Cf. United States v. Mance,* 26 MJ 244, 253 (CMA) ("[A] person does not possess a substance unless he is aware of its presence. If someone slips a drug into a servicemember's pocket without his being aware thereof ..., then he lacks the 'knowledge' requisite for possession."), *cert. denied,* 488 U.S. 942, 109 S.Ct. 367, 102 L.Ed.2d 356 (1988).

## III

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.